UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

F.E., by and through his parent and next friend, )
R.E., )
)
    Plaintiff, )
)
v. )    **Civil Action No. 18-30142**
)
GREGG BIGDA, STEVEN VIGNEAULT, )
RUPERT DANIEL, MATTHEW BAIRD, )
in their individual capacities, and CITY OF )
SPRINGFIELD, )
)
    Defendants. )
_____ )

## COMPLAINT

### INTRODUCTION

1. This is a civil rights action for excessive force by four police officers from two different police agencies against a 14-year-old boy. On February 26, 2016, Defendant Stephen Vigneault, a Springfield police officer, left his undercover SUV running outside a pizza shop in Springfield as he went inside to get his pizza. The SUV was stolen. Eventually, the SUV was retrieved in the Town of Palmer and three minors, including Plaintiff F.E., were apprehended.

2. F.E. was brought to the ground and repeatedly bitten by a police dog assigned to Defendant Matthew Baird, a Massachusetts State Trooper. As F.E. lay face-down and handcuffed on the street, Defendant Gregg Bigda, a Springfield police officer, kicked him in the face and spit on him. Bigda, joined by Defendant Vigneault, continued to assault the defenseless F.E. After F.E. was taken to the hospital, Officer Bigda was recorded on video at

the Palmer police station threatening the other two boys and bragging about how he could brutalize them and plant drugs on them with impunity.

3. Defendant Rupert Daniel, a Springfield police captain, authorized Defendants Bigda, Vigneault, and other Springfield Police Department (SPD) officers to leave Springfield to pursue the stolen SUV even though there was no lawful basis for them to do so and despite the clear risk that the officers would violate the rights of anyone they caught.

4. Defendant City of Springfield is sued for its policy or custom of tolerating unreasonable force and other misconduct by its police officers. These policies permitted its police officers to believe they could violate civilian's civil rights with impunity. The City's policies or customs permitted Officer Bigda to continue working as a police officer despite his long and well-known history of using unreasonable force against civilians.

## JURISDICTION AND VENUE

5. This action is brought under 42 U.S.C. § 1983 and § 1988 for violation of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and § 1343 provide jurisdiction over all federal claims, and 18 U.S.C. § 1367 provides supplemental jurisdiction over state law claims.

## PARTIES

6. Plaintiff, F.E., is a minor child residing in West Springfield, Massachusetts. At the time of the incident on February 26, 2016, he was 14 years old. He is of Puerto Rican descent. This case is brought on his behalf by his mother and next friend, R.E.

7. Defendant Gregg Bigda was at all times relevant to this complaint a duly appointed police officer of the Springfield Police Department. His actions alleged in the complaint were taken under color of law. He is sued in his individual capacity.

8. Defendant Steven Vigneault was at all times relevant to this complaint a duly appointed police officer of the Springfield Police Department. His actions alleged in the complaint were taken under color of law. He is sued in his individual capacity.

9. Defendant Rupert Daniel was at all times relevant to this complaint a duly appointed captain of the Springfield Police Department. His actions alleged in the complaint were taken under color of law. He is sued in his individual capacity.

10. Defendant Matthew Baird was at all times relevant to this complaint a duly appointed trooper in the Massachusetts State Police. His actions alleged in the complaint were taken under color of law. He is sued in his individual capacity.

11. Defendant City of Springfield is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts.

**FACTS**

**A.  The February 26, 2016 incident**

12. On February 26, 2016, Defendants Gregg Bigda and Steven Vigneault, along with fellow Springfield Police Officers Luke Cournoyer, Matthew Reif, Juan Rodriguez, and Jose Robles, were on duty on the 4 p.m.–to–midnight shift. All six officers were part of the SPD Narcotics Bureau.

13. At approximately 10:20 p.m., Officer Vigneault drove an undercover police SUV to Primo's Pizzeria in Springfield to pick up dinner for himself and the other narcotics

officers. Officer Vigneault knew that Officer Bigda had been drinking rum, and he hoped that eating pizza would help him sober up.

14. Officer Vigneault left the SUV, an unmarked 2002 Chevy Trailblazer, idling and unattended in front of the pizza shop while he went inside. While waiting in the restaurant for his order, Officer Vigneault saw the Trailblazer drive away.

15. Officer Vigneault immediately called Officer Bigda, who drove to Primo's to pick him up.

16. Officer Vigneault informed SPD dispatch of the incident, and a BOLO ("Be on the Lookout") for the car went out to all area police patrols over the Western Massachusetts Law Enforcement Channel ("WMLEC").

17. Officers Bigda and Vigneault and other SPD officers remained at the police station past the end of their shifts at midnight. Officer Bigda and others were drinking alcohol and growing increasingly intoxicated. Officer Bigda had been drinking rum throughout the evening.

18. At around 2:40 a.m. on February 27, 2016, Officer Christopher Rogers of the Wilbraham Police Department ("WPD") saw the blue Chevy Trailblazer drive past him and through a stop sign.

19. Officer Rogers activated his blue emergency lights and drove behind the SUV, but it did not stop.

20. Officer Rogers, soon joined by WPD officers in other police vehicles, followed the SUV through Wilbraham and into the neighboring town of Palmer.

21. WPD dispatch notified the SPD and the Palmer Police Department ("PPD") of the chase. The Palmer police set out tire deflation devices in the SUV's path.

22. The stop sticks punctured two of the SUV's tires. The SUV stopped in Palmer, where PPD officers found the vehicle unoccupied with the engine running and two doors open.

23. Defendant Rupert Daniel, a captain in the SPD narcotics unit, was the duty supervisor for the overnight shift. Captain Daniel knew that there was no legitimate reason for SPD narcotics officers to pursue the stolen SUV outside of Springfield. On information and belief, he also knew or should have known that during his duty shift some of the officers, including Officer Bigda, had been drinking alcohol at the police station.

24. Captain Daniel knew that Officer Bigda was an overly aggressive officer with a history of committing violence against civilians.

25. Captain Daniel authorized the SPD officers to leave Springfield to obtain the missing SUV. Captain Daniel told Officers Bigda and Vigneault, "You own it but you are on your own time."

26. Captain Daniel should not have permitted SPD officers to go to Wilbraham or Palmer to retrieve the SUV or to take custody of prisoners. It was foreseeable that officers whose shift had ended—and who had a personal stake in ending the embarrassment of having left an undercover police vehicle idling unattended so it could be taken—would commit misconduct in this situation. It was foreseeable that intoxicated police officers would commit misconduct in this situation.

27. The fact that Officers Bigda and Vigneault were personally affected by the theft increased the likelihood that they would commit misconduct. Given Officer Bigda's well-known history of using unreasonable force, allowing him to be involved in pursuing the SUV created an obvious risk that he would inflict serious harm on the suspects.

28. Officers Bigda, Vigneault, and the other four SPD narcotics officers soon arrived in Palmer to join the pursuit.

29. Roger Tucker, then the Chief of the Wilbraham Police Department, stated that the SPD officers had no business being on the scene of the arrest.

30. Defendant Matthew Baird of the Massachusetts State Police ("MSP") K-9 Unit heard about the pursuit over the WMLEC channel and arrived at the abandoned SUV with his K-9, Caber.

31. Using a jacket obtained from the vehicle, Trooper Baird and Caber began a track of the vehicle's occupants.

32. After a short search, Caber pulled Trooper Baird toward the side stairs of the porch at 1598 North Main Street, a multi-unit residence.

33. F.E. was standing on the porch with two of his friends, also minors. F.E. was 14 years old. His friends, R.D. and T.J., were 15 and 16, respectively.

34. Trooper Baird deployed his K-9 and instructed him to apprehend the boys.

35. Frightened and startled by the full-sized German Shepherd coming toward them, F.E. and R.D. jumped off the porch and ran into the street.

36. The K-9 gave chase to F.E. and quickly caught him, seizing and biting his upper left thigh and buttocks area. F.E. fell to the ground. Caber continued to attack and nip at him, biting him in the forearm.

37. WPD Officer Rogers ordered the other boy, R.D., to lie face down on the ground and put his hands behind his back. R.D. complied, and Officer Rogers placed him in handcuffs.

38. F.E. remained face down on the ground while Trooper Baird tried to gain control of Caber.

39. At about this time, the SPD narcotics officers arrived at the scene on foot.

40. Officer Bigda approached R.D., who was handcuffed and lying face down on the concrete, and kicked him in the face.

41. Officer Bigda then approached F.E., who was also handcuffed and lying face down on the concrete, and kicked him in the face.

42. Officers Bigda and Vigneault either assaulted F.E. or failed to intervene to prevent other police officers from assaulting F.E. despite having an opportunity to do so. During the assault, officers punched F.E. in the face several times.

43. F.E., who was already restrained, did not resist or present a threat to anyone's safety. The officers had no legitimate reason to use physical force against F.E.

44. As a result of being kicked and punched in the face, F.E. began bleeding profusely from his nose onto his sweatshirt and the street. Defendant Bigda had F.E.'s blood on his hand.

45. As F.E. lay handcuffed on the ground, the officers allowed a K-9 to approach F.E. and bite him. The officers allowed the attack despite their obligation and opportunity to prevent this unreasonable use of force.

46. As the police violence against him went on, F.E. repeatedly screamed, "They're going to kill me! They're going to kill me!" R.D. and T.J., cuffed and seated on the curb, watched in horror.

47. At the end of these attacks, Officer Bigda spit on F.E. and said, "Welcome to white town, motherf---ers."

48. Nearly an hour after F.E. was first apprehended, an ambulance arrived to take F.E. to Baystate Wing Memorial Hospital in Palmer ("Wing Memorial").

49. At Wing Memorial, F.E., suffering from traumatic shock and severe pain in his face, leg, and arm, was handcuffed to his bed. He received treatment for a dog bite on his left upper leg and buttocks containing four puncture wounds and associated contusions, along with numerous abrasions to the forehead.

50. Police officers took R.D. and T.J. to the Palmer police station for a "courtesy booking" for SPD.

51. After briefly continuing to search on foot for a fourth boy, the six SPD narcotics officers arrived at the Palmer police station.

52. Once T.J. and R.D. were placed into holding cells, Officers Bigda, Cournoyer, and Palmer officer Eric Raymond interrogated them for nearly an hour.

53. Unbeknownst to the SPD officers, the PPD's surveillance system recorded the interrogation in its entirety in video and audio.

54. The video shows Officer Bigda repeatedly berating, threatening, and intimidating the two boys, while Officers Cournoyer and Raymond stand by and assist.

55. Officer Bigda's statements include the following:

   a. "Who's the kid at the hospital the dog—oh, look at that! Know what that is? That's his motherf---ing blood" [points to toe of right boot];

   b. "Anything you say doesn't come true, I find out you're lying… see that [points to right, then left shoe] . . . that'll be yours on this shoe" [meaning blood];

   c. "You know what I have in Springfield? We don't have a nice new department like this. You know in my department— see that camera up there? It don't f---ing exist so anything that happens to you at my place, never happened. If I don't write it in a report, it never f---ing happened";

   d. "I'm not hampered by the f---ing truth 'cause I don't give a f---! People like you belong in jail. I'll charge you with whatever—I'll stick a f---ing kilo of coke in your pocket and put you away for 15 years"; and

   e. "I'm gonna kick you right in the f---ing face as soon as we cross the Springfield line."

56. After F.E. was treated at Wing Memorial, he was brought to the Palmer police station to be booked. Despite F.E.'s clear state of physical and emotional distress, SPD Officer Cournoyer escorted him into a holding cell and interrogated him.

57. Still intoxicated, Defendants Bigda and Vigneault, along with the other SPD Narcotics officers, then drove F.E. and the other boys to SPD's Youth Aid Bureau for further processing.

9

**B.     Policies, customs, and practices of the City of Springfield**

   **i.     Failure to supervise or discipline Officer Bigda**

58.   Officer Bigda graduated from the police academy and became a Springfield police officer in 1994.

59.   From January 2000 to the time of the incident in February 2016, Officer Bigda was the subject of at least 24 internal investigations of misconduct at the Springfield Police Department.

60.   Thirteen of the 24 internal investigations involved complaints that Officer Bigda, alone or in concert with other Springfield officers, used excessive force.

61.   The allegations of excessive force against Officer Bigda included the following:

   a.   Holding a civilian's leg against the hot tailpipe of a police cruiser;

   b.   Hitting a civilian in the head with a flashlight during an arrest;

   c.   Mistaking an innocent man for a suspect, dragging him from his car, handcuffing him, and beating him in the head and neck;

   d.   Cursing and striking several women, one of whom was pregnant, in the presence of their children;

   e.   Grabbing a Chicopee police officer from his unmarked police vehicle, spinning him around, and shoving him against the car door, solely because the officer was a dark-skinned Hispanic male; and

   f.   Choking, kicking, and assaulting the complainant's mentally disabled son, breaking his jaw, and pointing a gun at the complainant's chest and stating, "I can't stand Puerto Ricans."

62. Other complaints against Officer Bigda included allegations of verbal abuse, harassment, and destruction of civilians' property. One complainant alleged that Officer Bigda and other officers maced her puppies, killing them.

63. Because the Springfield Police Department's Internal Investigation Unit ("IIU") has long been biased in favor of police officers, none of these 24 internal investigations resulted in a sustained finding of wrongdoing against Officer Bigda.

64. The Springfield Police Department also did not discipline Officer Bigda for lying in court. In at least three criminal cases, a Superior Court judge found that Officer Bigda had provided false testimony, but the SPD took no action.

65. At the time of the incident, Officer Bigda had not received any discipline, retraining, warning, or reprimand for any of his actions as a Springfield police officer.

66. Officer Bigda was not disciplined for his conduct in this case until after the Palmer police station video—which captured Bigda bragging about kicking F.E. and threatening the two boys in his custody with further violence, as well as bragging that he could plant cocaine on a young man and send him to prison for 15 years—was made public.

67. Officer Bigda has been named as a defendant in at least seven civil rights lawsuits alleging police misconduct. At least four of these lawsuits alleged that Officer Bigda used excessive force against civilians.

68. Other allegations in the lawsuits against Officer Bigda include lying to cover up criminal conduct by fellow Springfield police officer Kevin Burnham and threatening to kill Officer Vigneault and Gail Gethins, another SPD officer.

69. A lawsuit filed in 2017 by Officer Vigneault (the "Vigneault Complaint") alleges that on every shift Officer Bigda drank beer or liquor to the point of intoxication. The Vigneault Complaint alleges that department supervisors knew about Officer Bigda's "spiraling alcohol problem" but allowed it to continue. The complaint alleges that supervisors protected Officer Bigda by ordering Officer Vigneault not to speak of Officer Bigda's on-duty drinking.

70. Despite the long history of serious allegations against him—and despite the misconduct that is the subject of this lawsuit—Officer Bigda remains on the police force. In 2017, he applied for a promotion to sergeant. Commissioner Barbieri signed off on Officer Bigda's candidacy.

71. Although Officer Bigda did not receive the promotion, the SPD has promoted other officers with criminal or disciplinary histories.

72. Of the five officers promoted to sergeant in 2018, one was found liable by a federal jury in 2014 for violating the civil rights of 15-year-old African American boy and causing his death, resulting in a $1.3 million verdict; one is suspected to have been part of a group of off-duty police officers who attacked a group of civilians outside a bar in 2015; and one had been arrested twice, including a 2014 arrest for drunk driving.

73. By promoting officers alleged or found to have committed crimes, acts of violence, and civil rights violations, the SPD sends a message to officers that the department does not take such misconduct seriously. Officers in turn feel emboldened to violate civilians' constitutional rights because the officers know that they will not suffer adverse consequences for doing so.

### ii.    SPD's policy of permitting civil rights violations by its police officers

74.    The City of Springfield allowed an unwritten policy and custom to develop in the Springfield Police Department of permitting officers—including but not limited to Officer Bigda—to use excessive and unreasonable force, to violate civil rights, and to commit misconduct with impunity.

75.    The SPD had a policy or custom of failing to discipline its officers who violate the rights of people in Springfield. The SPD rarely sustained civilians' complaints of police misconduct, including complaints of excessive force. This policy or custom led Springfield police officers, including but not limited to Officer Bigda, to believe they could violate individuals' civil rights with impunity because they knew they would not be disciplined for misconduct.

76.    The SPD did not have a properly functioning internal affairs unit. The IIU did not properly investigate allegations of misconduct, including allegations of excessive force, against SPD police officers. The IIU was biased toward police officers, favoring their testimony over that of civilians and ignoring credible evidence of officers' misconduct.

77.    When determining officers' discipline, Commissioner Barbieri considered, in part, the likelihood of the discipline being sustained based on other cases where suspensions or terminations have been overturned by arbitrators or civil service. Commissioner Barbieri chose not to fire Officer Bigda because the City of Springfield's legal and human resources departments advised him that a firing would not survive an expensive civil service appeal.

78.    Years before the incident, the City of Springfield voluntarily entered into a contract with the police union that prohibited the SPD from bringing disciplinary charges

against an officer more than 90 days after the incident or after the date the SPD learned of the potential violation, whichever is later. Commissioner Barbieri admitted that this provision hindered the Department's ability to discipline officers. This unreasonably short time period for bringing internal complaints allowed officers to commit misconduct with impunity.

79. These policies and customs of the City of Springfield were the moving force behind the violations of F.E.'s constitutional rights committed by Officer Bigda, Officer Vigneault, and Captain Daniel.

**C.     F.E.'s injuries**

80. As a direct and proximate result of Defendants' conduct, F.E. suffered physical and emotional injuries, described below. He also incurred medical expenses.

81. F.E. suffered from a fractured nose, two black eyes, and numerous head contusions and abrasions. In the weeks following the assault, F.E. suffered from ongoing symptoms consistent with a traumatic head injury, including headaches, dizziness, anxious and angry mood, and increased aggression and impulsivity.

82. F.E. suffered a dog bite on his left upper leg and buttocks containing four puncture wounds, and a dog bite on his left forearm. He continued to suffer from pain and soreness in the days following the dog attack and has permanent scarring and deformity as a result of the bites.

83. F.E. suffered from severe emotional distress. This distress manifested in various ways, including trauma-induced disassociation regarding the attack; hypervigilance; increased anger, aggression, agitation, and impulsivity; difficulty sleeping; feelings of

hopelessness about his future; feelings of numbness about the world around him; feelings of mistrust toward others; and fear of large dogs.

**COUNT I     42 U.S.C. § 1983 against Defendants Bigda, Vigneault, and Baird**

84.     The above paragraphs are incorporated by reference.

85.     Defendants Bigda, Vigneault, and Baird, acting under of color of law, used unreasonable force against Plaintiff F.E., depriving him of his clearly established right to be free from the use of unreasonable force by police officers under the Fourth Amendment to the United States Constitution, as applied under the Fourteenth Amendment.

86.     Defendants Bigda, Vigneault, and Baird acted jointly and in concert with one another in violating F.E.'s constitutional rights.

87.     Defendants Bigda, Vigneault, and Baird allowed or failed to prevent a Massachusetts State Police K-9 to attack F.E. in violation of his constitutional rights.

88.     Defendants Bigda, Vigneault, and Baird acted with reckless disregard for Plaintiff's constitutional rights.

89.     As a direct and proximate result of Defendants' actions, Plaintiff suffered the damages described above.

**COUNT II     42 U.S.C. § 1983 against Defendant Daniel**

90.     The above paragraphs are incorporated by reference.

91.     Defendant Daniel knew that allowing Defendants Bigda and Vigneault and other SPD officers to leave Springfield to retrieve the missing SUV, under the circumstances described above, posed a substantial risk of serious harm to anyone apprehended for the

15

theft. As the officers' supervisor, he had the ability and the duty to prevent the officers from becoming involved in the pursuit. Instead, he authorized their pursuit.

92. Defendant Daniel was deliberately indifferent to the obvious risk that Defendants Bigda and Vigneault would use unreasonable force against anyone suspected of stealing the SUV.

93. As a direct and proximate result of Defendant Daniel's actions, Plaintiff suffered the damages described above.

**COUNT III 42 U.S.C. § 1983 against the City of Springfield**

94. The above paragraphs are incorporated by reference

95. The individual SPD Defendants' violations of Plaintiffs' constitutional rights were caused by the policies and customs of the City of Springfield described above.

96. As a direct and proximate result of the City of Springfield's actions, Plaintiff suffered the damages described above.

**WHEREFORE**, Plaintiff requests that this Court:

1. Award compensatory damages;
2. Award punitive damages against Defendants Bigda, Vigneault, Daniel, and Baird;
3. Award the costs of this action including reasonable attorney's fees; and,
4. Award such other further relief as this Court deems appropriate and necessary.

**JURY DEMAND**

A trial by jury is hereby demanded on all claims.

RESPECTFULLY SUBMITTED,

For Plaintiff F.E.,
By his attorneys,

/s/ Howard Friedman
Howard Friedman, BBO #180080
David Milton, BBO #668908
**Law Offices of Howard Friedman, P.C.**
90 Canal Street, Fifth floor
Boston, MA 02114-2022
617-742-4100
hfriedman@civil-rights-law.com
dmilton@civil-rights-law.com

/s/ Lauren M. Marcous
Lauren M. Marcous, BBO #686376
**Law Office of Lauren M. Marcous**
75 Marketplace, 3rd Floor, #63
Springfield, MA 01003
413- 282-8239
lauren@marcouslaw.com

Dated: August 28, 2018